IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PALMTOP PRODUCTIONS, INC.,

    Plaintiff,

       v.

                            CIVIL ACTION FILE
                            NO. 1:04-CV-3606-TWT

LO-Q PLC, et al.,

    Defendants.

OPINION AND ORDER

      This is a patent infringement action.  It is before the Court for construction of the claims in United States Patent No. 5,978,770.

## I.  BACKGROUND

      Plaintiff PalmTop Productions, Inc. is the owner of  United States Patent No. 5,978,770 (the "'770 patent"), which was issued by the United States Patent and Trademark Office on November 2, 1999.  The '770 patent claims "[a] system and method for assigning and managing patron reservations to one or more of a plurality of attractions" using wireless personal communications devices.  (Abstract.)  In response to long lines and unpleasant wait times associated with attractions at amusement parks, the '770 patent describes a system whereby a patron is able to receive information about and make reservations for various attractions without

having to physically wait in the attraction's queue.  More specifically, the patron receives a personal communications device ("PCD") through which the patron is able to select a desired attraction.  The PCD then generates a reservation request that is transmitted to a computer associated with the particular attraction.  The attraction computer receives the request, determines a proposed reservation time, and communicates that time back to the patron through the PCD.  The patron is then given the option of accepting or declining the proposed reservation time.  If the proposed reservation time is accepted, it is recorded in the virtual queue, which acts in concert with the physical queue associated with the attraction.

Defendants Lo-Q, PLC and Lo-Q Virtual Queuing, Inc. (collectively referred to as "Lo-Q") manufacture virtual queue management systems for use in theme parks. In particular, Lo-Q makes and uses a virtual queue management system called the Lo-Q Guest Services System.  Defendants Six Flags, Inc., Six Flags Theme Parks, Inc., and Six Flags Operations, Inc. (collectively referred to as "Six Flags") have installed, used, and operated the Lo-Q Guest Services System in a number of Six Flags amusement parks.  The Plaintiff claims that the Defendants have infringed the '770 patent.  The Defendants filed a counterclaim seeking a declaratory judgment that the '770 patent is invalid and unenforceable, alleging that it does not met one or more of the conditions for patentability set forth in 35 U.S.C. §§ 102, 103, and 112.  The

merits of the parties' claims cannot be addressed until the Court determines the proper scope and meaning of the patent claims.  Thus, claims construction is the first step of the analysis.  <u>C.R. Bard, Inc. v. United States Surgical Corp.</u>, 388 F.3d 858, 861 (Fed. Cir. 2004).

There are six patent claims at issue: claims 5, 17, and 19 are independent claims.  Claim 18 is dependent on claim 17, and claims 25 and 26 are dependent on claim 19.  Claim 5 contains a number of the disputed terms and phrases and is generally representative of the other claims.  It reads as follows:

> A system for assigning and managing patron reservations to one or more of a plurality of attractions, comprising:
>
> at least one *personal communication device (PCD)*, each *PCD associated with at least one patron,* each *PCD* for *generating at least one reservation request specifying a selected one of the attractions*, for *transmitting the reservation request*, and for *receiving a proposed reservation time* for the *reservation request;* and
>
> at least one *computer*, each *computer associated with at least one of the attractions*, each *computer* for *receiving a transmitted reservation request specifying the attraction associated with the computer*, for *determining a proposed reservation time* for the received reservation request, and for *transmitting the proposed reservation time to the PCD* which generated the *reservation request;*
>
> wherein each *computer* comprises:
>
> a *communications module* for receiving transmitted reservation requests from any of the PCDs;

a *virtual queue* for *storing reservation information* for a plurality of reservations for the *attraction associated with the computer*;

an information storage device for *storing information describing the associated attraction*; and

a *request processor* coupled to the *communications module*, the *virtual queue*, and the information storage device, for *determining a proposed reservation time* for a *received reservation request responsive to information describing the associated attraction* and to *reservation information* for *previously-made reservations*.

('770 patent, claim 5) (emphases added).  The parties move the Court to construe the italicized disputed terms and phrases.[1]

## II.  CLAIMS CONSTRUCTION STANDARD

The construction of claims in a patent case is a matter for the Court.  Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).  In construing patent claims, the Court looks first to the intrinsic evidence.  The intrinsic evidence consists of the patent itself, the claim terms, the specification (or written description), and the patent prosecution history, if in evidence.  Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, 1346 (Fed. Cir. 2004).  However, not all intrinsic evidence is equal.  Digital

---

[1]The parties agreed on the construction of the following terms and phrases: "information storage device," "receiving," "alerting," "predetermined time interval," "retrieving," "using," "coupled to the communications module, the virtual queue, and the information storage device," "coupled to the communications module and the virtual queue," and "PCD which generated the reservation request."  (Joint Claim Construction Statement at 1-2.)

Biometrics, Inc. v. Identix, Inc., 149 F.3d 1335, 1344 (Fed. Cir. 1998). First among intrinsic evidence is the claim language. Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999). A "bedrock principle" of patent law is that the claims of the patent define the patentee's invention. Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Thus, the Court's focus must "begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to particularly point out and distinctly claim the subject matter which the patentee regards as his invention." Gillette Co. v. Energizer Holdings, Inc., 405 F.3d 1367, 1370 (Fed. Cir. 2005) (quoting Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001)); see also Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."). When reading claim language, terms are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the art at the time of the invention. Phillips, 415 F.3d at 1313-14; see also Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002) ("The terms used in the claims bear a "heavy presumption" that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art.").

Thus, an objective baseline from which to begin a claim construction is to determine how a person of ordinary skill in the relevant art would understand the terms.  Phillips, 415 F. 3d at 1313.  Although "the claims of the patent, not its specifications, measure the invention," Smith v. Snow, 294 U.S. 1, 11 (1935), the person of ordinary skill in the art is deemed to read the claim terms in the context of the entire patent, including the specification, rather than simply in the context of the particular claim in which the disputed term appears.  Phillips, 415 F.3d at 1313.  For instance, the patentee may act as his own lexicographer and set forth a special definition for a claim term.  However, in order for that special definition to control, it must be clearly stated in the specification or during the patent prosecution. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996); Markman, 52 F.3d at 980; see also Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001) (patentee may act as own lexicographer by "clearly setting forth an explicit definition for a claim term that could differ in scope from that which would be afforded by its ordinary meaning"); Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc., 214 F.3d 1302, 1307 (Fed. Cir. 2000) ("Absent an express intent to impart a novel meaning, claim terms take on their ordinary meaning.").  Similarly, the patentee may limit the scope of a claim by using words or "expressions of manifest exclusion

or restriction, representing a clear disavowal of claim scope." <u>Teleflex, Inc. v. Ficosa N. Am. Corp.</u>, 299 F.3d 1313, 1325 (Fed. Cir. 2002).

Claims are part of a "fully integrated written instrument" and, therefore, "must be read in view of the specification, of which they are a part." <u>Phillips</u>, 415 F.3d at 1315. In fact, the specification is "the single best guide to the meaning of a disputed term" and is often dispositive. <u>Id.</u> (quoting <u>Vitronics Corp.</u>, 90 F.3d at 1582). Nevertheless, the Court must be careful not to read a limitation into a claim from the specification. <u>Liebel-Flarsheim Co. v. Medrad, Inc.</u>, 358 F.3d 898, 904 (Fed. Cir. 2004). In particular, the Court cannot limit the invention to the specific examples or preferred embodiments found in the specification. <u>Phillips</u>, 415 F.3d at 1323; <u>see also</u> <u>Resonate Inc. v. Alteon Websystems, Inc.</u>, 338 F.3d 1360, 1364-65 (Fed. Cir. 2003) ("[A] particular embodiment appearing in the written description may not be read into a claim when the claim is broader than the embodiment."). In addition to the specification, the prosecution history may be used to determine if the patentee limited the scope of the claims during the patent prosecution. <u>Southwall Techs., Inc. v. Cardinal IG Co.</u>, 54 F.3d 1570, 1576 (Fed. Cir. 1995). The prosecution history helps to demonstrate how the patentee and the Patent and Trademark Office ("PTO") understood the patent. <u>Phillips</u>, 415 F.3d at 1317. However, because the prosecution history represents the ongoing negotiations between the PTO and the patentee, rather

than a final product, it is not as useful as the specification for claim construction purposes.  Id.

Extrinsic evidence, such as expert and inventor testimony, dictionaries, and learned treatises, is only considered when the claim language remains genuinely ambiguous after considering all of the patent's intrinsic evidence.  Tegal Corp. v. Tokyo Electron America, Inc., 257 F.3d 1331,1342 (Fed. Cir. 2001).  Although less reliable than the patent and prosecution history in determining construction of claim terms, extrinsic evidence may be used to help the Court understand the technology or educate itself about the invention.  Phillips, 415 F.3d at 1317; Vitronics Corp., 90 F.3d at 1584.  In particular, because technical dictionaries collect accepted meanings for terms in various scientific and technical fields, they can be useful in claim construction by providing the Court with a better understanding of the underlying technology and the way in which one skilled in the art might use the claim terms. Phillips, 415 F.3d at 1318.  But, extrinsic evidence, including dictionary definitions, cannot be used to vary or contradict the terms of the patent claims.  Tegal Corp., 257 F.3d at 1342; see also Vitronics Corp., 90 F.3d at 1584 n.6 (courts are free to consult dictionaries "so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents"), quoted in Phillips, 415 F.3d at 1322-23.

### III. DISCUSSION

The parties disagree about the construction of the following terms and phrases present in claims 5, 17, 18, 19, 25, and 26 of the '770 patent: (1) "personal communication device (PCD)"; (2) "associated with at least one patron"; (3) "reservation"; (4) "reservation request"; (5) "generating at least one reservation request"; (6) "specifying a selected one of the attractions"; (7) "transmitting the reservation request"; (8) "proposed reservation time"; (9) "receiving a proposed reservation time"; (10) "computer"; (11) "associated with at least one of the attractions"; (12) "attraction computer associated with one of the attractions"; (13) "computer associated with the selected attraction"; (14) "attraction associated with the computer"; (15) "associated attraction"; (16) "specifying the attraction associated with the computer"; (17) "transmitting the proposed reservation time to the PCD"; (18) "communications module"; (19) "receiving a transmitted reservation request"; (20) "virtual queue"; (21) "storing"; (22) "information describing the associated/selected attraction"; (23) "request processor"; (24) "determining a proposed reservation time"; (25) "determines the proposed reservation time"; (26) "received reservation request"; (27) "responsive to"; (28) "previously-made reservation"; (29) "information

describing previously-made reservations"; (30) "reservation information"; (31) "generating on a PCD."[2]

A.    "personal communication device" ("PCD")

The Defendants argue that this term should be construed as part of a means-plus-function limitation because "personal communication device" does not connote sufficient structure for performing the claimed functions, i.e., "generating at least one reservation request," "transmitting the reservation request," and "receiving a proposed reservation time."  Pursuant to 35 U.S.C. § 112, ¶ 6, patentees may draft claims as means-plus-function or step-plus-function limitations.  In such a format, a patentee may "recite a function to be performed as a claim limitation rather than reciting structure or materials for performing that function."  Omega Eng'g, Inc. v. Raytek Corp., 334 F.3d 1314, 1322 (Fed. Cir. 2003).  The claim, however, will cover only the corresponding step or structure disclosed in the specification and its equivalents.  35 U.S.C. § 112, ¶ 6; CCS Fitness, Inc. v. Brunswick Corp., 288 F.3d 1359, 1369 (Fed. Cir. 2002).  The construction of a means-plus-function limitation follows a two-step

---

[2]In its proposed claim construction, the Plaintiff identifies "determining" as a disputed term.  However, the parties do not appear to argue that "determining" warrants further construction.  Indeed, the Plaintiff asserts in its brief that "'determining' is widely used and recognized and does not require construction to enhance clarity."  (Pl.'s Corrected Br. Regarding Claim Construction at 17; see also id. at 24.)  The Defendants do not appear to disagree.  As such, the Court sees no need to construe the term.

approach.  First, the claimed function is identified based on the claim language and the limitations expressed in the claims.  Next, the court ascertains the corresponding structure in the written description that performs the identified function.  Omega Eng'g, Inc., 334 F.3d at 1321.  "A disclosed structure is corresponding only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim."  Id. (internal punctuation and citation omitted).  Only those structures that are "necessary to perform the claimed function" may be incorporated from the written description.  Micro Chem., Inc. v. Great Plains Chem. Co., Inc., 194 F.3d 1250, 1258 (Fed. Cir. 1999); see Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1334-35 (Fed. Cir. 2004) (structures are superfluous if "they are not required for performing the claimed function").

Before engaging in a means-plus-function construction, however, the court must determine if § 112, ¶ 6 is applicable to the particular claim.  The use of the term "means" is "central to the analysis because the term 'means,' particularly as used in the phrase 'means for,' is part of the classic template for functional claim elements." Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1358 (Fed. Cir. 2004) (internal punctuation and citations omitted).  Accordingly, "[a] claim limitation that actually uses the word 'means' invokes a rebuttable presumption that § 112, ¶ 6 applies."  CCS Fitness, Inc., 288 F.3d at 1369.  In those instances, the "means" term

is "essentially a generic reference for the corresponding structure disclosed in the specification." Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1308 (Fed. Cir. 1998). Conversely, if a claim term does not use "means," there is a rebuttable presumption that § 112, ¶ 6 does not apply. CCS Fitness, Inc., 288 F.3d at 1369.

In this case, the claims at issue do not contain the term "means." Therefore, there is a rebuttable presumption that § 112, ¶ 6 does not apply. This presumption is "a strong one that is not readily overcome." Lighting World, Inc., 382 F.3d at 1358. Nevertheless, the presumption may be rebutted if the "claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." Id. (internal punctuation and citation omitted). In order to recite sufficient structure, a claim term need not denote a specific structure. Id. at 1359. Rather, "it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function." Id. at 1359-60; see also CCS Fitness, Inc., 288 F.3d at 1369 ("To help determine whether a claim term recites sufficient structure, we examine whether it has an understood meaning in the art.").

The Defendants, as the parties advocating construction under § 112, ¶ 6, bear the burden of establishing that the claims fail to recite sufficient structure.  See Linear Tech. Corp. v. Impala Linear Corp., 379 F.3d 1311, 1319 (Fed. Cir. 2004).  This burden must be met by a preponderance of the evidence.  Apex Inc. v. Raritan Computer, Inc., 325 F.3d 1364, 1372 (Fed. Cir. 2003).  The Defendants have offered no evidence to overcome the presumption and support their assertion that "personal communication device" does not connote sufficient structure.  To the contrary, the Plaintiff's expert, a professor in the electrical engineering and communications field, testified that a person of ordinary skill in the art would understand "personal communication device" to have an ordinary meaning and denote a portable device capable of transmitting and receiving information.  (Frost Decl. ¶ 4.)  The fact that the term does not specifically evoke a particular structure does not prevent the term from connoting structure.  See Apex Inc., 325 F.3d at 1372 ("[A] claim term need not call to mind a single well-defined structure to fall within the ambit of § 112, ¶ 6.") (internal punctuation and citation omitted).  Nevertheless, the Defendants argue that "device" is a generic structural term and, therefore, does not connote sufficient structure.  See Personalized Media Commc'ns, LLC v. International Trade Comm'n, 161 F.3d 696, 704 (Fed. Cir. 1998).  However, they ignore the fact that the term "device" is modified by "personal communications."  Such an adjectival qualification,

or identifier, serves to narrow the scope of the structure and makes the term more definite.  Personalized Media Commc'ns, LLC, 161 F.3d at 704; see also Apex Inc., 325 F.3d at 1373-74 (although term "circuit" does not always connote sufficient structure, adding identifiers such as "interface," "programming," and "logic," identifies some structural meaning).  Because the Defendants have failed to rebut the presumption that § 112, ¶ 6 does not apply, the Court finds that the term "personal communication device" is not a means-plus-function limitation.  Therefore, the Court must determine the correct construction of the structural term "personal communication device."

The Plaintiff proposes that "personal communication device" means "portable hand-held device capable of communicating information."  This construction is supported by the specification.  For instance, the specification states that "[t]he present invention relates to scheduling patron reservations in facilities offering numerous attractions, and more particularly, to systems, methods, and apparatuses for assigning and managing reservations using wireless personal communication devices." (col. 1, ll. 8-12.)  In an effort to remove the inconvenience of time spent waiting in lines, one purpose of the invention is to allow patrons to schedule reservations remotely while engaging in other activities.  (See col. 2, ll. 36-42.)  The "personal communication device" is the device through which the patron may schedule reservations.

Accordingly, a "personal communication device" must be portable and, thus, hand-held.  In addition, in order for the present invention to function effectively, the PCDs must be able to transmit and receive information with the other components of the system responsible for establishing reservations via a wireless communication network.  (See col. 2, ll. 53-55; col. 3, ll. 3-7; col. 6, ll. 7-10.)

Although they agree that "personal communication device" is a portable hand-held device, the Defendants' proposed construction includes a number of additional elements.  According to the Defendants, the specification clearly defines "personal communication device" as:

> A portable computing device that includes: a CPU or microprocessor, a data storage device, a display screen, input device (such as a pen-based input), auxiliary output device, wireless communication hardware and software, a user interface designed to accept input from the user, patron information storage, and storage containing a list of attractions.

In support, the Defendants cite to Figure 1A, which illustrates the "hardware architecture of a personal communication device according to the present invention," col. 4, ll. 9-11, as well as various parts of the specification that discuss the structure of the PCD.  Figure 1A indicates that a personal communication device includes: (1) an input device; (2) random access memory ("RAM"); (3) wireless transmitter/receiver; (4) a CPU; (5) a screen; (6) other output; and (7) a disk drive.  Consistent with Figure 1A, in the section devoted to "System Architecture," the

specification states that PCDs are small, hand-held portable computers that include a microprocessor or CPU, display screen, auxiliary output device, input device, RAM, and a storage device.[3]  (col. 5, l. 62 to col. 6, l. 1.)  The inclusion of the display screen and input device requirements is further supported by a portion of the specification that states that "[e]ach PCD includes a screen display for displaying text and graphic information as well as an input device for receiving input from the patron using the device."  (col. 2, ll. 59-62.)  As noted above, to function consistent with the present invention, PCDs must also include "wireless communication hardware 112 for transmission and reception of data to other components of system 100 over wireless communications network."  (col. 6, ll. 7-10; see also col. 3, ll. 3-4.)

Although the specification supports the inclusion of a number of the Defendants' proposed limitations, namely a CPU or microprocessor, data storage device, display screen, input device and output devices, wireless communication hardware and software, the same cannot be said for the following limitations: (1) a user interface designed to accept input from the user; (2) patron information storage; and (3) storage containing a list of attractions.  As noted above, claim construction starts with the language of the claims themselves.  Semitool, Inc. v. Dynamic Micro

---

[3]Although these elements are described as part of a preferred embodiment, the inclusion of each structural element is consistent with the overall purpose and function of the present invention in general.

<u>Sys. Semiconductor Equip. GMBH</u>, 444 F.3d 1337, 1346 (Fed. Cir. 2006) (<u>quoting</u>

<u>Phillips</u>, 415 F.3d at 1314) ("Quite apart from the written description and the

prosecution history, the claims themselves provide substantial guidance as to the

meaning of particular claim terms.").  The Federal Circuit has also explained that:

> Other claims of the patent in question, both asserted and unasserted, can
> also be valuable sources of enlightenment as to the meaning of a claim
> term.  Because claim terms are normally used consistently throughout the
> patent, the usage of a term in one claim can often illuminate the meaning
> of the same term in other claims.

<u>Phillips</u>, 415 F.3d at 1314 (internal citations omitted).  "Personal communication

device" appears in numerous claims other than claims 5, 17, and 19.  Although not

directly at issue in the present construction, the language of these claims is useful in

discerning which structural elements may not be an inherent part of the ordinary

meaning of "personal communication device."  For instance, claim 1 includes

language indicating that the "PCD comprises . . . a *user interface* for receiving the

reservation request from the patron and for providing output to the patron; . . . [and]

*patron information storage* coupled to the user interface and to the request generation

module, for storing information describing the patron . . . ." (col. 25, ll. 47-50, 58-60)

(emphases added).  Similarly, claim 14 states, in pertinent part: "a personal

communication device associated with at least one patron, comprising . . . a *user*

*interface* for receiving from the patron a reservation request for a selected attraction;

. . .[and] *patron information storage* coupled to the user interface for storing information describing the patron . . . ." (col. 30, ll. 7-10, 22-23) (emphases added). (See also col. 26, ll. 30-33 (claim 3); col. 27, ll. 4-7 (claim 4); col. 28, ll. 29-36 (claim 10); col. 29, ll. 30-33 (claim 12), ll. 50-53 (claim 13).)  The fact that other claims describe specific elements that are part of a PCD, namely the user interface and patron information storage, indicates that the patentee did not contemplate that "personal communication device" inherently includes those limitations.  See Phillips, 415 F.3d at 1325 (inclusion in other claims of particular functions served by "baffles" "makes it likely that the patentee did not contemplate that the term 'baffles' already contained that limitation").  Thus, the Court will not read the "user interface designed to accept input from the user" and the "patron information storage" limitations into the construction of "personal communication device."

Moreover, the doctrine of claim differentiation provides support for excluding "patron information storage" from the ordinary meaning of "personal communication device."  As discussed above, "patron information storage" appears in a number of claims as a PCD limitation.  However, the phrase is not found in all claims describing the PCD.  For instance, claims 3 and 4 set forth what the PCD comprises but "patron information storage" is not included as a limitation.  Under the doctrine of claim differentiation, "[t]he presence of a specific limitation in one claim gives special

significance to the absence of that specific limitation in another claim, in that it shows that when the limitation was intended it was expressed." <u>Acacia Media Techs. Corp. v. New Destiny Internet Group</u>, 405 F. Supp. 2d 1127, 1137 (N.D. Cal. 2005) (<u>citing Hoganas AB v. Dresser Indus., Inc.</u>, 9 F.3d 948, 950 (Fed. Cir. 1993)).  As such, the fact that "patron storage information" is present in some claims but not others indicates that the limitation is not an inherent requirement of a PCD.

Finally, the Defendants contend that in order to allow patrons to select an attraction, "personal communication device" must include "storage containing a list of attractions."  In support of this limitation, the Defendants rely on a portion of the specification that describes attraction description records.  However, in the paragraph immediately preceding the identified portion, the specification states that the PCD "*optionally* contains descriptions of the various attractions in the park, stored in attraction description storage."  (col. 7, ll. 52-54) (emphasis added).  Additionally, in describing the "PCD Operation," the specification indicates that "[a]ttraction description information *may be provided* to PCD 102 for local storage in attraction descriptions 205."  (col. 13, ll. 49-50) (emphasis added).  Although it may be preferable or advantageous to include attraction information in the PCD, it is clear from the specification that "storage containing a list of attractions" is not required. Therefore, the Court will not read this limitation into the ordinary meaning of

"personal communication device."   Rather, consistent with the claims and specification, the Court construes "personal communication device" as "a portable hand-held device capable of receiving and transmitting information – that includes a CPU or microprocessor, a data storage device, a display screen, input device,  output device, and wireless communication hardware and software."

      B.    <u>"associated with at least one patron"</u>

Claim 5 sets forth, in relevant part, "[a] system for assigning and managing patron reservations to one or more of a plurality of attractions, comprising: at least one personal communication device (PCD), each PCD *associated with at least one patron* . . . ." (col. 27, ll. 26-29) (emphasis added).  The specification indicates that each PCD is "associated with a patron or group of patrons visiting the park."  (col. 5, ll. 60-61.) Consistent with this, the Plaintiff contends that the ordinary meaning of "associated with at least one patron" is simply "in an identifiable relationship with at least one patron."  In proposing this construction, the Plaintiff relies on the dictionary definition of "associated" as "closely connected, joined, or united with another (as in interest, function, activity or office)."   <u>Webster's Third New International Dictionary (Unabridged)</u> 132 (1993).  The Defendants argue that the Plaintiff improperly relies on a dictionary definition to establish the ordinary meaning of the term.  However, while cautioning against excessive reliance on dictionaries, the Federal Circuit has

stated that the use of dictionaries is not precluded. <u>Pfizer, Inc. v. Teva Pharms., USA,</u>
<u>Inc.</u>, 429 F.3d 1364, 1375 (Fed. Cir. 2005); <u>Phillips</u>, 415 F.3d at 1321-22.

The Defendants also argue that because the personal communication device is inherently "in an identifiable relationship with at least one patron," the Plaintiff's construction is unduly broad and renders the "associated with" portion of the phrase meaningless.  Instead, the Defendants propose the following construction: "for at least one customer of a group assigned to the PCD, there is a unique information record for the customer stored locally in the PCD."  Neither the claims nor the specification supports this limiting construction.  The Defendants point to several instances in the specification that discuss how patrons may input into the PCD various information describing their groups.  (<u>See</u> col. 2, l. 63 to col. 3, l. 2; col. 6, l. 67 to col. 7, l. 8.) However, these portions of the specification simply describe the manner in which patrons may initiate use of the PCD.  They do not limit the ordinary meaning of "associated with at least one patron."   Finding no support for the Defendants' proposed construction, the Court finds that the ordinary meaning of "associated with at least one patron" is "in an identifiable relationship with at least one patron."

C.    <u>"reservation"</u>

The term "reservation" is found throughout all of the claims at issue.  The Plaintiff contends that "reservation" means "a position or positions in the virtual

queue for an attraction."  Noting that "reservation" is part of a larger phrase, the Defendants argue that the term should not be given a single construction but should be construed only in the context of the different phrases in which it is used, i.e., "reservation information for previously-made reservations," "information describing previously-made reservations," and "proposed reservation time."  However, "reservation" also appears as a stand-alone term in a number of claims.  For instance, claim 5 sets forth "[a] system for assigning and managing patron *reservations* to one or more of a plurality of attractions . . ." and claim 19 teaches "[a] method of assigning and managing patron *reservations* to one or more of a plurality of attractions . . . ." (col. 27, ll. 26-27; col. 31, ll. 14-15.)  Furthermore, despite arguing that construction of "reservation" is improper or unnecessary, the Defendants use the term itself in a number of its proposed constructions without further elaboration as to what the term refers to.  Under these circumstances, the Court finds that an independent construction of "reservation" will serve to clarify the constructions of the various phrases in which the term appears.

The present invention focuses on the ability of "patrons in an amusement park or other facility to schedule reservations in queues for attractions and other services." (col. 2, ll. 47-49.)  Webster's Dictionary defines "reservation" as "an engaging in advance of some accommodation or service; [or] a promise, guarantee, or record of

such engagement."   <u>Webster's Third New International Dictionary (Unabridged)</u> 1930 (1976).  Nothing in the intrinsic evidence suggests that the ordinary meaning of "reservation," as informed by the dictionary, does not control.  Therefore, in the context of this invention, "reservation" refers to a time or position, secured in advance and recorded in the virtual queue, when the patron may be admitted to a particular attraction.  (<u>See</u> col. 12, ll. 51-52; col. 13, ll. 29-32.)  Because the Plaintiff's construction is consistent with the ordinary meaning of the term as well as the specification, the Court adopts the Plaintiff's construction.  "Reservation" means "a position or positions in the virtual queue for an attraction."

      D.    <u>"reservation request"</u>

The Plaintiff proposes the following construction: "a signal that initiates the processing of a reservation."  The Defendants appear to agree that a "reservation request" is a type of signal or message sent to request a reservation.  However, they argue that the Plaintiff's construction is too broad because it does not specify what types of information must be included to identify the signal as associated with requesting a reservation and distinguish it from other transmitted messages.  Thus, the Defendants propose the following more detailed construction of the term:

> A data message including the following content: (a) an identifier of the message as a reservation request; (b) unique identifier designating the attraction to be reserved; (c) either (1) data designating a particular requested reservation time slot or (2) data representing a request for the

next available time slot for the reservation; (d) request ID, which is a unique identification number for the particular request; and (e) a unique PCD ID.

The Plaintiff argues that the Defendants improperly import from the specification examples of data that may be included in a request message. "Reservation request" is not defined in the specification.  But the specification does describe the components of a reservation request message, which mirror those proposed by the Defendants, i.e., PCD ID, reservation request identifier, request ID, attraction ID, and time.  (col. 15, l. 56 to col. 16, l. 27.)  However, that section merely describes one embodiment of the invention and makes clear that it is only preferable for the reservation request to include the specified information.  (col. 15, ll. 48-56.)  In fact, the inclusion of an identifier of the message as a request is expressly described by the specification as a preferred embodiment.  (col. 15, l. 61 to col. 16, l. 4.)  Moreover, the specification states that additional information and formatting may be included in the data structure of a reservation request.  (col. 16, ll. 28-38.)  Because this portion of the specification merely describes a preferred embodiment, it cannot be used to limit the construction of the term.  See Phillips, 415 F.3d at 1323.

The Defendants also argue that the construction requires a "unique identifier designating the attraction to be reserved."  This is known in the specification as an Attraction ID.  Construing "reservation request" as inherently including an Attraction

ID would render superfluous other portions of the claims.  Specifically, claim 5 refers to the PCD generating and the computer receiving a reservation request "specifying a selected one of the attractions" or "specifying the attraction associated with the computer."  (col. 27, ll. 31-32, 38-39.)  Because the Attraction ID is the mechanism by which the selected attraction is specified or identified, the "specifying" clause following reservation request would be redundant and unnecessary if the ordinary meaning of "reservation request" included this data.  Accordingly, this limitation will not be read into the claim.

Although a number of the Defendants' proposed limitations cannot be read into the claim, the specification does support limiting the construction of "reservation request" to some extent.  The specification states that "the [reservation] request may specify a particular time of day that the patron is interested in, or it may simply request the next available time for attending the attraction."  (col. 12, ll. 27-29.) Additionally, the Plaintiff acknowledges that in order to process a reservation, the signal must identify either the patron or the personal communication device associated with the patron.  (Pl.'s Resp. to Defs.' Opening Claim Construction Brief at 17-18.) Therefore, the Court construes "reservation request" to mean "a data message that initiates the processing of a reservation that includes at least a patron or PCD identification."

E.   "generating at least one reservation request" and "transmitting the reservation request"

The Defendants argue that these phrases are part of the means-plus-function construction of personal communication device. As discussed above, this argument is without merit. Setting aside this argument, the Defendants agree with the Plaintiff that "transmitting" does not require further construction. (Defs.' Responsive Claim Construction Br. at 8.) Webster's Dictionary defines "generate" as "to cause to be: bring into existence." Webster's Third New International Dictionary (Unabridged) 945 (1993). Therefore, incorporating the previous construction of "reservation request," the Court construes "generating at least one reservation request" to mean "bringing into existence at least one reservation request."

F.   "specifying a selected one of the attractions"

This disputed phrase appears as follows in claim 5: "[A]t least one personal communication device (PCD), each PCD associated with at least one patron, each PCD for generating at least one reservation request *specifying a selected one of the attractions* . . . ." (col. 27, ll. 29-32) (emphasis added). Similarly, claim 19 provides for "generating on a personal communication device (PCD) a reservation request *specifying a selected one of the attractions*." (col. 31, ll. 16-18) (emphasis added). The Plaintiff claims that the phrase means "identifying one of a plurality of attractions." The Defendants do not propose a different construction of this phrase.

Rather, they simply state that the plain language of the phrase makes clear that the generated reservation request must specify one attraction and that the particular attraction must have been chosen by the patron.   (Defs.' Responsive Claim Construction Br. at 9.)   Therefore, it appears that the parties are effectively in agreement as to the proper construction of this phrase.   Seemingly relying on a dictionary definition of "specifying," neither party addresses how a reservation request "specifies" the selected attraction.   However, as discussed above in relation to "reservation request," the specification indicates that the particular attraction is identified in the reservation request through an Attraction ID:

> ATTRACTION_ID 423 is a unique identification number that identifies the attraction for which the reservation is intended.   This enables the communications modules 207, 211 to properly direct the request to the appropriate attraction computer 101.

(col. 16, ll. 12-16.)  Although the ordinary meaning of "reservation request" by itself does not require inclusion of an Attraction ID, it is clear that this data is used to specify the attraction for which a reservation is requested.   Therefore, based on the intrinsic evidence, the Court construes "specifying a selected one of the attractions" as "identifying one of a plurality of attractions chosen by the patron through a corresponding Attraction ID."

      G.    <u>"proposed reservation time"</u>

The parties' constructions of this disputed phrase are similar in that they agree that the ordinary meaning of the phrase includes the fact that the reservation time can be accepted or rejected by the patron.  (See Pl.'s Resp. to Defs.' Opening Claim Construction Br. at 15.)  However, both the Plaintiff and the Defendants propose additional elements in their constructions.   Incorporating its construction of "reservation," the Plaintiff claims that "proposed reservation time" means "a time reflective of a position in the virtual queue to be set forth for acceptance or rejection."[4] The Defendants argue that the proper construction of "proposed reservation time" must adequately distinguish between a "proposed" and an "actual" reservation time. Specifically, the Defendants advocate the following construction: "a reservation time that can be accepted or rejected by the patron, and requires an acceptance response from the patron before it becomes an actual reservation."  Nothing in the claims or the specification support the Defendants' contention that the construction of this phrase should contain language regarding converting a proposed reservation time to an actual reservation time through patron acceptance.  Rather, the fact that "reservation time" is modified by "proposed," i.e., set forth for acceptance or rejection, is sufficient to

---

[4]The Plaintiff originally construed this phrase to mean "an *estimated* time reflective of a position in the virtual queue to be set forth for acceptance or rejection." However, the Plaintiff amended its construction to eliminate the "estimated" requirement.  (Pl.'s Resp. to Defs.' Opening Claim Construction Br. at 16.)

indicate that the reservation time is merely a requested or pending reservation that is not yet an actual reservation.  Although the specification discusses the fact that proposed reservations will be cancelled absent an acceptance response by the patron, it is not necessary to read this limitation into the ordinary meaning of "proposed reservation time."  Thus, the Court rejects the second clause of the Defendants' construction and construes "proposed reservation time" to mean "a time reflective of a position in the virtual queue that can be accepted or rejected by the patron."

H.    "receiving a proposed reservation time"

The Defendants argue that "receiving a proposed reservation time" is not an independent phrase that warrants construction but, rather, is a limitation associated with "personal communication device."  Alternatively, the Defendants argue that if "personal communication device" is construed as a means-plus-function under § 112, ¶ 6, then "receiving a proposed reservation time" indicates a function.  As discussed above in relation to the construction of "personal communication device," the Defendants' arguments are without merit.  The Court has previously construed "proposed reservation time," and "receiving" is a widely recognized term and does not require further construction.

I.    "computer"

Although "computer" is found without a modifier in many instances throughout the specification and claims, the term appears to be used interchangeably with "attraction computer."    This conclusion is supported by the figures and the specification.  In Figure 1, which is "a block diagram of a system according to the present invention," col. 4, ll. 7-8, the only computers included are attraction computers.  (See also col. 5, ll. 2-4.)  Similarly, Figure 6 illustrates the manner in which the attraction computer operates in accordance with the present invention.  (col. 4, ll. 50-51.)    As more direct evidence that the terms are synonymous, where "computer" is used in the specification instead of "attraction computer," the reference is to "computer 101" which corresponds with the attraction computer in Figures 1, 2, and 6.  (col. 11, l. 66; col. 12, ll. 38, 47-48; col. 13, l. 19; col. 17, ll. 1, 35-36, 43, 57; col. 18, ll. 5, 16, 26; col. 19, l. 51.)  Furthermore, in the section titled "Attraction Computer Operation," the specification alternates between "attraction computer" and the shorthand reference to "computer," thereby evidencing the fact that the two terms are interchangeable.  (col. 20, l. 5 to col. 22, l. 51.)  Therefore, the ordinary meanings of "computer" and "attraction computer" are identical in the context of the present invention.

The specification essentially defines this term by stating that attraction computers are implemented with: (1) a microprocessor or central processing unit

(CPU); (2) random-access memory; (3) disk storage; (4) input device such as a keyboard or mouse; and (5) output device such as a display screen; and (6) wireless communication hardware and software.   (col. 5, ll. 15-29.)   Additionally, the specification provides that the attraction computers may be: (1) components of a single computer system or group of computer systems wherein each component may be a distinct processor or processing node within the computer or group; or (2) separate computers that are physically disposed at or near the associated attractions. (col. 5, ll. 5-12.)  Despite the fact that the specification describes two acceptable structures for the attraction computer, the Defendants' proposed construction limits the "attraction computer" to "a stand-alone computer physically disposed near one of the attractions."[5] On the other hand, the Plaintiff's proposed construction is consistent with the specification: "a computer system including one or more processors, storage devices, and associated hardware/software/peripheral components, where the peripheral components may be distinct processors or processing nodes capable of processing information."  Therefore, modifying the Plaintiff's construction to reflect the specification more accurately, the Court construes "computer" and "attraction computer" as "a computer system including a processing unit, random-access

---

[5]The Defendants do not propose a construction of "computer," deeming it inappropriate to do so out of context.

memory, disk storage, input and output devices, applicable wireless communication hardware and software, which may be implemented as: (1) a distinct processor or processing node within a computer system or group of computers; or (2) a separate computer physically disposed at or near its associated attraction."

      J.      "associated with at least one of the attractions"

The Plaintiff argues that the ordinary meaning of "associated" is "closely connected, joined or united with another (as in interest, function, activity or office)." Webster's Third New International Dictionary (Unabridged) 132 (1993). Relying on this definition, the Plaintiff claims that "associated with at least one of the attractions" simply means "in identifiable relationship with at least one or more of the attractions." The Defendants counter that merely defining "associated" as "in identifiable relationship" is too broad because it does not illustrate how the computer is closely connected to the attraction. Accordingly, the Defendants propose the following construction:

> A computer provided for an attraction that receives a data message based upon a particular Attraction ID specified in the data message. Each computer can either be (1) a stand-alone computer disposed physically near the attraction or (2) a component of a single computer system, including respective specialized software as required by other limitations within claim 5. A single computer system that handles more than one attraction will have a corresponding number of components, and each component is a distinct processor or processing node for each attraction.

The Defendants' construction and argument seem to incorporate the construction of "computer," which has been discussed above.  It appears that the only part of this construction specifically dealing with the "associated with at least one of the attractions" phrase is the portion that references the receipt of an Attraction ID.  According to the Defendants, the specification indicates that the computer is associated with the attraction based on the Attraction ID because this unique number enables the communication module to recognize and properly direct messages addressed to the attraction computer.  (col. 7, l. 65 to col. 8, l. 2; col. 20, ll. 18-20.)  While the Attraction ID may indeed aid the communication module in properly directing incoming data messages, it does not define how an attraction computer is associated with an attraction.  Thus, the Defendants' reference to the receipt of an Attraction ID is unnecessary to the construction of "computer associated with at least one of the attractions" and not supported by the specification.  On the other hand, the Plaintiff's proposed construction appears to be consistent with the ordinary meaning of the phrase.  "Associated with at least one of the attractions" means "in identifiable relationship with one or more of the attractions."

      K.    <u>"attraction computer associated with one of the attractions"</u>

This phrase, which is found in claim 17, is substantially similar to the above-construed phrase, the only difference being the omission of "at least."  The Defendants

argue that this difference is significant.  Specifically, the Defendants maintain that the use of "at least" in claim 5 implies that attraction computers handle multiple attractions and contemplates the possibility of a distributed system whereas the absence of the term in claim 17 indicates that each attraction computer must have a one-to-one relationship with the attraction.  Based on this rationale, they contend that "computer associated with one of the attractions," as used in claim 17, means:

> A stand-alone computer physically disposed near one of the attractions, which receives a data message based upon a particular Attraction ID specified in the data message.  The computer will have specialized software as required by other limitations within claim 17.

Despite their attempts to limit the structure of the attraction computer referenced in claim 17, the specification does not support the Defendants' construction.  As discussed above, the specification clearly states that an attraction computer can be either: (1) a component of a computer system or group of computer systems; or (2) a separate computer physically disposed at or near the associated attraction.  (col. 5, ll. 4-12.)  The Defendants seem to misinterpret what constitutes an attraction computer. With regard to the first embodiment of an attraction computer, the computer system as a whole is not considered the attraction computer.  Rather, each component, like the stand-alone computer, is deemed an attraction computer that is associated with a particular attraction.  Nothing in claim 17 indicates that one structure is required or preferred over another.  Therefore, similar to the above-construed phrase, the Court

construes "attraction computer associated with one of the attractions" as "attraction computer in identifiable relationship with one of the attractions."

      L.     <u>"computer associated with the selected attraction"</u>

The Plaintiff contends that this phrase, which is found in claim 19, means "a computer with which at least one attraction is in identifiable relationship." The Defendants again limit the construction of computer to a stand-alone computer and argue that the phrase implies that a message containing an Attraction ID has been generated. Thus, the Defendants propose the following construction:

> A stand-alone computer physically disposed near one of the attractions, which receives a data message based upon a particular attraction selected on the user interface of the PCD and specified in Attraction ID of the data message. The computer will have specialized software as required by other limitations within claim 19.

The Court finds that neither party's construction is supported by the language of claim 19 or by the specification.

The starting point for construing claim terms is the language of the claims themselves. <u>Gillette Co.</u>, 405 F.3d at 1370. Here, the disputed phrase is found in claim 19 as follows:

> A method of assigning and managing patron reservations to one or more of a plurality of attractions, comprising:
>
> a) generating on a personal communication device (PCD) a reservation request specifying a selected one of the attractions;

b) transmitting the reservation request to a *computer associated with the selected attraction*;

c) receiving the reservation request at the *computer associated with the selected attraction* . . . .

(col. 31, ll. 14-22.)  Used in this context, it is apparent that the computer is associated with one particular attraction that has been chosen by the patron from the various attraction options.   As such, the Plaintiff's construction, which states that the computer is merely in an identifiable relationship with at least one attraction is overly broad.   While it might be the case that the computer is also in an identifiable relationship with other attractions, the computer must be associated with the one specific attraction selected by the patron.

While the Plaintiff's construction is too broad, the Defendants' construction is too narrow in that it imports limitations that are not required by the claims or the specification.   First, the Defendants limit the computer at issue to a stand-alone computer located in close proximity to the selected attraction.   However, as discussed above, the specification clearly states that an attraction computer can be either a component of a computer system or group of computer systems or it can be a separate computer physically disposed at or near the associated attraction.   (col. 5, ll. 4-12.) Claim 19 does not specify the type of computer that must be associated with the selected attraction and, thus, the limitation will not be read into the construction.

Second, in construing "selected attraction," the Defendants refer to the Attraction ID. Again, the Court finds this irrelevant to the construction of the term.  Finally, the Defendants argue that the construction should include the fact that the attraction was "selected on the user interface of the PCD."  This addition is consistent with the specification, which states: "First, the patron requests 302 a reservation for a selected attraction by entering the request using user interface 201 of PCD 102."  (col. 12, ll. 25-27; see also col. 14, ll. 36-51.)  Nevertheless, the manner in which the patron physically selects the attraction is not necessary to the ordinary meaning of selected attraction.  Therefore, as informed by the claim language and the specification, the ordinary meaning of "computer associated with the selected attraction" is "computer in identifiable relationship with the specific attraction chosen by the patron."

      M.    "attraction associated with the computer"

The Plaintiff proposes the following construction: "an attraction with which the computer is in identifiable relationship."  The Defendants have not proposed a competing construction for this particular phrase.  Because the Plaintiff's construction is consistent with the ordinary meaning of the phrase, the Court construes "attraction associated with the computer" as "an attraction with which the computer is in identifiable relationship."

      N.    "associated attraction"

Claim 18 states:

> The attraction computer of claim 17, further comprising:
>
> an information storage device for storing information describing the *associated attraction*;
>
> and wherein the request processor determines the proposed reservation time responsive to information describing the *associated attraction* and to reservation information for previously-made reservations.

(col. 31, ll. 6-13) (emphasis added).  Used in this context, "associated attraction" essentially means the "attraction associated with the computer," i.e., the above-construed phrase.  Because neither the specification nor the claims themselves indicate that different meanings should be afforded the phrases, the same construction will apply to both.  "Associated attraction" means "an attraction with which the computer is in identifiable relationship."

O.     "specifying the attraction associated with the computer"

This disputed phrase is similar to the previously-construed phrase "specifying a selected one of the attractions."  Both phrases, which are found in claim 5, describe information that is included within a reservation request.  As discussed above, the specification indicates that an attraction is specified in a reservation request through an Attraction ID.  Accordingly, in this context, "specifying" refers to the use of an Attraction ID.  Incorporating the previous construction of "attraction associated with the computer," the Court construes "specifying the attraction associated with the

computer" as "identifying the attraction, through an Attraction ID, with which the computer is in an identifiable relationship."

    P.    <u>"transmitting the proposed reservation time to the PCD"</u>

"Transmitting" is the only word in this disputed phrase that has not been construed.  The ordinary meaning of "transmit" is "to send out."  <u>Webster's Third New International Dictionary (Unabridged)</u> 2429 (1976).  Thus, as proposed by the Plaintiff, "transmitting the proposed reservation time to the PCD" means "sending the proposed reservation time to the PCD."

    Q.    <u>"communications module"</u>

Claim 5 describes a computer which comprises "a *communications module* for receiving transmitted reservation requests from any of the PCDs; . . . [and] a request processor coupled to the *communications module* . . . for determining a proposed reservation time . . . ."  (col. 27, ll. 43-54) (emphasis added).  Claim 17 contains similar language.  The Defendants contend that "communications module" should be construed as a means-plus-function limitation under § 112, ¶ 6.  However, the term "means" is absent from the claims and, thus, there is a presumption that § 112, ¶ 6 does not apply.  In an effort to rebut the presumption, the Defendants claim that "communications module" lacks definite structure.  But, as with "personal communication device," they present no evidence in support of this conclusory

assertion.  As the Federal Circuit has emphasized, determining if a term connotes sufficient structure depends on "whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for.'"  <u>Lighting World, Inc.</u>, 382 F.3d at 1360.  "Communications module," and even "module," represents more than a mere verbal construct serving as a "means for" substitute.  For example, <u>The American Heritage Dictionary of the English Language</u> (4th ed. 2000), defines "module," in the electronics sense, as "a self-contained assembly of electronic components and circuitry, such as a stage in a computer, that is installed as a unit."  <u>See</u> <u>Lighting World, Inc.</u>, 382 F.3d at 1361 (dictionary definitions consulted to determine if "connector" has a reasonably well-understood meaning as a name for structure); <u>Linear Tech. Corp.</u>, 379 F.3d at 1320 (technical dictionary aids determination that "circuit" is structural).  Thus, "module" connotes definite structure, and when combined with "communications," which describes the module's operation, sufficient structural meaning will likely be conveyed to a person of ordinary skill in the art.  In fact, the Plaintiff's expert testified that: "A person of ordinary skill in the art would recognize the structural connotation of the term Communications Module and would understand it to mean a [sic] electromagnetic transceiver and attendant software.  An electromagnetic transceiver

is capable of receiving and transmitting wireless signals such as RF, microwave and infrared radiation." (Frost Decl. ¶ 5.)  Consequently, the "communications module" limitation of claims 5 and 17 is not a means-plus-function limitation.

Because they contend that "communications module" is a means-plus-function limitation, the Defendants do not propose an independent construction of the term. The Plaintiff, however, claims that the term means "a transmitter/receiver designed for data transmission."  This construction is consistent with the specification, which provides, for instance, that communication modules receive and transmit reservation requests and information.  (col. 9, ll. 1-3; col. 10, ll. 4-11; col. 20, ll. 20-26.)  The specification further states that the communications module "is implemented using wireless transmitter/receiver and attendant software." (col. 9, ll. 3-5; col. 10, ll. 9-10.) As such, the Court will adopt the Plaintiff's proposed construction of "communications module."

R.    "receiving a transmitted reservation request"

Claims 5 and 17 refer to a computer and a communications module that are used for "receiving a transmitted reservation request." (col. 27, ll. 36-37, 44-45; col. 30, ll. 62-63.) The Defendants maintain that the disputed phrase is simply part of the limitation associated with the means-plus-function analysis of "communications module."  Not only does this argument ignore the fact that "receiving a transmitted

reservation request" is not always paired with communications module, but the Court has already determined that communications module is not properly construed in means-plus-function terms. The Court has previously construed "reservation request." "Receiving" and "transmitted," two commonly understood words, do not require construction.

S.   "virtual queue"

The Plaintiff proposes the following construction for "virtual queue": "an electronically-stored representation of a physical queue including reservation information for an attraction retained in solid-state memory such as RAM, magnetic storage such as a disk drive, or other electronic storage facility." The Defendants acknowledge that a "virtual queue" consists of a list of pending and confirmed reservations. (Defs.' Opening Claim Construction Br. at 44.) Nevertheless, the Defendants argue that "virtual queue" is part of a means-plus-function limitation in claims 5 and 17, and a step-plus-function limitation in claim 19. Step-plus-function limitations, like means-plus-function limitations, are permitted under § 112, ¶ 6 for method claims. Similar to the use of "means," if a claim uses the term "steps for," it signals the patentee's intention to invoke § 112, ¶ 6. Likewise, the absence of that language creates a contrary presumption. Cardiac Pacemakers, Inc. v. St. Jude Med.,

Inc., 381 F.3d 1371, 1382 (Fed. Cir. 2004); Masco Corp. v. United States, 303 F.3d 1316, 1326 (Fed. Cir. 2002).  None of the claims at issue contain "means" or "steps for" language and, thus, it is presumed that § 112, ¶ 6 is not applicable.  The Defendants have not offered any evidence to rebut the presumption, and the Court sees no basis for construing "virtual queue" as a means- or step-plus-function limitation.  Instead, the Court agrees with the Plaintiff that "virtual queue" is intrinsically defined in the specification.  As noted above, the present invention is directed at a system and method for assigning and managing patron reservations in such a way that the patron can avoid unnecessary time spent waiting in lines, or physical queues, for attractions or other activities.  As explained in the Background section of the specification, "[i]t is desirable to allow a patron to effectively 'wait' in line while engaging in other activities in the park . . . so that the time spent waiting is otherwise productive, thus reducing the feeling of having wasted time when delays or malfunctions occur."  (col. 2, ll. 37-43.)  Therefore, rather than standing in a physical queue, the patron is able to maintain his position *in absentia* through a reservation electronically stored in the attraction computer.  (See col. 10, ll. 61-63 ("Virtual queue 210 is preferably stored in RAM 123 and may be stored, or mirrored to magnetic storage such as disk drive . . . .").)  More specifically, the reservations are recorded in the "virtual queue," as described in the specification.

> Virtual queue 210 maintains a list of pending and confirmed reservations for the attraction.   Virtual queue 210 holds a varying number of reservations, each reservation having data identifying or describing the patron holding the reservation, and either a time or position for the reservation.

(col. 10, ll. 12-16.)  Therefore, consistent with the specification, the Court will adopt the Plaintiff's construction and construe "virtual queue" as "an electronically-stored representation of a physical queue including reservation information for an attraction retained in solid-state memory such as RAM, magnetic storage such as a disk drive, or other electronic storage facility."

      T.    "storing"

The Plaintiff proposes that "storing" be construed as "recording data in an electronic device from which the data can be obtained as needed."  The Defendants do not specifically object to the Plaintiff's construction.  Instead, they contend that "storing" is part of the limitation in the means- and step-plus-function analyses involving "virtual queue" and, therefore, does not warrant separate construction.  This argument fails for two reasons.  First, as discussed above, "virtual queue" does not constitute means- or step-plus-function limitations.  Second, the Defendants ignore the fact that although "storing" appears with "virtual queue" in claims 5, 17, and 19, the term can also be found in numerous other claims and not in connection with "virtual queue."  For instance, claim 18 states: "an information storage device for

*storing* information describing the associated attraction." (col. 31, ll. 8-9.) Additionally, claims 23, 24, and 29 refer to "storing" patron and attraction description information in the PCD. (col. 31, ll. 47, 55-57; col. 32, ll. 20-22.) Although these particular claims are not at issue in this claim construction, "claim terms are normally used consistently throughout the patent." Phillips, 415 F.3d at 1314. "Storing," therefore, "should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent." Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001).

As a commonly understood word, construction of the term "storing" simply requires application of the widely accepted meaning of the term. Desper Prods., Inc. v. QSound Labs, Inc., 157 F.3d 1325, 1336 (Fed. Cir. 1998). In such circumstances, general dictionaries may be used to ascertain the meaning of the term. Phillips, 415 F.3d at 1322. Relevant to this context, Webster's Dictionary defines "store" as "to record (information) in an electronic device (as a computer) from which the data can be obtained as needed." Webster's Third New International Dictionary (Unabridged) 2252 (1993). Nothing in the specification or claims suggests that the ordinary meaning of the term does not control. Because it is consistent with the ordinary meaning of the term, the Court adopts the Plaintiff's construction of "storing."

U.    "information describing the associated/selected attraction"

The Plaintiff proposes that this phrase be construed generally to mean "data representing at least one characteristic of any aspect of the associated attraction." The Defendants contend that "information describing the associated/selected attraction" means:

> Preset static information, such as attraction's capacity, throughput, description of the attraction, height and weight requirements for patrons, geographic location, hours of operation, cycle capacity, estimated throughput, estimated downtime, nominal staff; or dynamic information such as current status, current throughput, current staff, today's throughput, and today's downtime for a particular attraction selected on the user interface of the PCD and specified in the Attraction ID of the reservation request generated by the PCD.

The Plaintiff argues that this construction improperly imports specific types of information about the attraction that are not required by the claim language or specification.

The Defendants' construction mirrors a portion of the specification that discusses the system architecture, and the attraction computer in particular. Although that section describes various implementation embodiments of the attraction computer, the specification makes clear that "[e]ach attraction computer maintains information describing the associated attraction." (col. 5, ll. 33-34.) The specification explains that the information maintained in the attraction computer includes "general static information such as the attraction's capacity, throughput, description of the attraction, height and weight requirements for patrons, geographic location, hours of

operation, and the like." (col. 5, ll. 34-38.)  The specification further states that the attraction computer "maintains information describing the current state and reservation status of the attraction." (col. 5, ll. 38-40.)  In a later section, the specification describes examples of static and dynamic information associated with the attraction that are used in scheduling reservations. (col. 11, l. 18 to col. 12, l. 3.) The specific types of information listed in this section, such as operating hours, cycle capacity, and current status, are "merely illustrative" of attraction information that may be stored. (col. 12, l. 8.)  However, it is apparent that attraction information should include some type of static and dynamic information.  Therefore, modifying the Defendants' proposed construction, the Court construes "information describing the associated/selected attraction" to mean "preset static information, such as cycle capacity, estimated throughput, and operating hours, and dynamic information, such as current status and current staff, for a particular attraction."

     V.    "request processor"

In the context of describing what the computer comprises, claim 5 contains the disputed term as follows:

> [A] *request processor* coupled to the communications module, the virtual queue, and the information storage device, for determining a proposed reservation time for a received reservation request responsive to reservation information for previously-made reservations.

(col. 27, ll. 51-56) (emphasis added).  The term appears in a similar manner in claims 17 and 18.  (col. 31, ll. 1-5, 10-13.)  Asserting that "request processor" does not connote any structure to one of ordinary skill in the art, the Defendants argue that the term must be construed as a means-plus-function limitation.  However, once again the term "means" is missing from each of the claims and the Defendants have not presented any evidence to overcome the presumption that § 112, ¶ 6 does not apply.  That sufficient structure is recited is evidenced by the fact that the claims provide that the "request processor" is coupled to various other hardware contained in the attraction computer.  Additionally, in the computer science field, a "processor" is the part of a computer that does data processing.  See The American Heritage Dictionary of the English Language (4th ed. 2000) (defining "processor" as "a. a computer; b. a central processing unit; c. a program that translates another program into a form acceptable by the computer being used.").  This connotes some structure.  In the context of the present invention, the adjectival phrase "request" gives the structure greater definition.  It is not uncommon for devices to take their names from the functions they perform.  Greenberg v. Ethicon Endo-Surgery, Inc., 91 F.3d 1580, 1583 (Fed. Cir. 1996).  Thus, to a person of ordinary skill in the art, "request processor" means part of the computer system that determines reservations based upon information received relevant to reservation requests.

The Plaintiff contends that "request processor" means "hardware and associated software application of computer system that receives requests and determines a proposed reservation position in the virtual queue."  This is consistent with the ordinary meaning of "request processor" as set forth in the specification.  For instance, the specification describes the "request processor" as follows:

> Attraction computer 101 contains a *request processor* 209 for processing reservation requests received by communications module 211, using information from virtual queue 201, attraction information storage 213, and physical queue monitor 103.  *Request processor* 209 is implemented as a software module running on CPU 120 in attraction computer 102. *Request processor* 209 operates as described below in connection with the state diagram shown in FIG. 6.

(col. 9, l. 63 to col. 10, l. 3) (emphases added).  The Defendants agree that the request processor includes certain software to process reservation requests.  Unlike the Plaintiff's more general construction, the Defendants contend that the software must perform in accordance with the algorithms described by Figure 7.  However, the specification makes clear that Figure 7 represents how a request may be processed in one embodiment.  (col. 22, ll. 23-27; see also col. 24, ll. 51-52 ("Other embodiments may be used in place of the method described by FIG. 7.").)  Thus, the limitations set forth in Figure 7 and the corresponding description in the specification will not be read into the claim.  The Court finds that the Plaintiff's construction is supported by the claims and the specification and construes "request processor" as "hardware and

associated software application of computer system that receives requests and determines a proposed reservation position in the virtual queue."

W.    "determining a proposed reservation time"

The Plaintiff maintains that "determining" does not require further construction. The Defendants agree with regard to this phrase as it appears in claim 26.  However, the Defendants contend that "determining a proposed reservation time" appears in claims 5 and 17 in the context of describing the function carried out by the request processor and, as such, the construction of the phrase cannot be separated from the means-plus-function analysis of "request processor."  However, as discussed above, "request processor" is not properly construed as a means-plus-function under § 112, ¶ 6.  Therefore, the Court finds that further construction of this phrase is unnecessary.

X.    "determines the proposed reservation time"

This phrase, which is found in claim 18, is virtually identical to the above-construed phrase, the only difference being the use of "determines" rather than "determining."  No further construction is necessary.

Y.    "received reservation request"

The only term in this disputed phrase, which is found in claim 17, that has not been construed previously is "received."  The parties agree that because "received" is a commonly understood word, it does not need further construction.


    Z.    <u>"responsive to"</u>

The disputed phrase "responsive to" of claims 5, 17, and 18 is found in the following context: "a request processor . . . for determining a proposed reservation time for a received reservation request *responsive to* information . . . ."  (<u>See</u> col. 27, ll. 51-55; col. 31, ll. 1-4, 10-11.)[6]  The Defendants argue that "responsive to" should be construed in this context and not in a vacuum.  The Plaintiff, however, contends that "responsive to" should be construed to mean "based on."  This construction is consistent with the ordinary meaning of the phrase and, thus, the Court adopts the Plaintiff's construction of "responsive to."

    AA.    <u>"previously-made reservation"</u>

The crux of the parties' dispute regarding the construction of this term is whether "previously-made reservation" refers to reservations previously made by all patrons or, as the Defendants contend, is limited to only those made by the requesting

---

[6]The slight differences in claims 5, 17, and 18 with regard to the phrasing of the surrounding context do not affect the construction of "responsive to."

patron.  The Plaintiff argues that the Defendants' construction improperly imports a limitation.  The Court agrees with both sides.  Claims must be read and construed in light of the specification.  <u>Phillips</u>, 415 F.3d at 1315.  For example, if the specification makes clear that a particular feature is not intended to be included in an invention, that feature will be excluded from the scope of the invention, even if the claim language in the abstract might be considered broad enough to include the feature.  <u>SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.</u>, 242 F.3d 1337, 1341 (Fed. Cir. 2001).  Here, although "previously-made reservation" could be viewed broadly to include all reservations, irrespective of the reserving party, the specification indicates otherwise.  The term "previously-made reservation" appears in numerous places throughout the specification where it associates the referenced reservation with the requesting patron.  (<u>See</u> col. 14, ll. 19-20; col. 15, ll. 7-8; col. 17, l. 66; col. 18, ll. 1, 5-6, 12, 32; col. 25, l. 10.)  For instance, the specification describes how, once a patron makes a reservation request, a proposed reservation time may be determined based on such things as patron information, patron location, and "other reservations describing *previously-made reservations by the patron*."  (col. 14, l. 60 to col. 15, l. 8) (emphasis added).  In another instance, the specification states that the patron may cancel or modify previously-made reservations directly through his PCD.  (col. 17, l. 66 to col. 18, l. 17; <u>see also</u> col. 14, ll. 13-20.)  The specification further states that

"[u]pon receipt of an ATTRACTION_UPDATE message . . . [i]f applicable, patron is alerted and notified that some *previously-made reservations* must be modified as a result of changes to attraction information."  (col. 18, ll. 30-33) (emphasis added). In other places, it is clear that the phrase is used to refer to reservations made by all patrons in the virtual queue.  (Abstract, lines 7-8.) In claim 5, the reference to "previously-made reservations" in the description of the reservation processor means "all previously-made reservations in the virtual queue by all patrons."

    BB.   <u>"information describing previously-made reservations"</u>

    Setting aside their differing constructions of "previously-made reservation," the resolution of which is discussed above, the parties propose similar constructions of the "information describing" portion of this disputed phrase.  The Plaintiff claims that "information describing" means "data descriptive of."  Similarly, the Defendants contend that the phrase means "records of."  The disputed phrase at issue is found in claim 26, a dependent claim which expands on the portion of claim 19 regarding determining a proposed reservation time after receiving a reservation request. Specifically, claim 26 provides that "information describing previously-made reservations," as well as "information describing the selected attraction," is used to determine a proposed reservation time.  "[T]he context of the surrounding words of the claim . . . must be considered in determining the ordinary and customary meaning

of . . . terms." <u>ACTV, Inc. v. Walt Disney Co.</u>, 346 F.3d 1082, 1088 (Fed. Cir. 2003);

<u>see also</u> <u>Phillips</u>, 415 F.3d at 1314 ("[T]he claims themselves provide substantial

guidance as to the meaning of particular claim terms.").  Therefore, considering the

purpose of this particular information, it is reasonable to assume that in order to

determine a legitimate proposed reservation time, the information regarding

previously-made reservations would require more than simply a record or indication

that such reservations have been made.  Because the Court finds that "data descriptive

of" more accurately reflects the ordinary meaning of "information describing" than

does "records of," the Court construes "information describing previously-made

reservations" as "data descriptive of previously-confirmed reservations made by all

patrons."

  CC. <u>"reservation information"</u>

  The Defendants assert that "reservation information" is merely part of the larger

phrase "reservation information for previously-made reservations," <u>see</u> col. 27, ll. 55-

56; col. 31, ll. 4-5, 12-13, and should be given the same construction as "information

describing previously-made reservations."  This proposition ignores the fact that

"reservation information" is not always associated with "previously-made

reservations."  For instance, claims 5 and 17 refer to "reservation information for a

plurality of reservations for the attraction associated with the computer."  (col. 27, ll.

46-48; col. 30, ll. 65-67.)  As previously noted, "the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims." Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc., 389 F.3d 1370, 1377 (Fed. Cir. 2004).  Nothing in the intrinsic evidence indicates that "reservation information" should be afforded different meanings.  Unlike the Defendants, the Plaintiff proposes a separate and more general construction of "reservation information" as "data reflecting the number and identifying information of patron(s) and their respective positions in the virtual queue."  This construction is consistent with the specification.  For example, the specification states: "Virtual queue 210 holds a varying number of reservations, each reservation having data identifying or describing the patron holding the reservation, and either a time or position for the reservation."  (col. 10, ll. 13-16.)  The Court therefore adopts the Plaintiff's construction of "reservation information."

      DD.   "generating on a PCD"

Claim 19 provides, in relevant part, that the "method of assigning and managing patron reservations to one or more of a plurality of attractions" includes "*generating on a personal communication device (PCD)* a reservation request specifying a selected one of the attractions."  (col. 31, ll. 14-18) (emphasis added.)  The Defendants argue

that this is a step-plus-function phrase because PCD does not connote any definite structure.  As discussed above, the Court has rejected this argument.  The only word left to be construed in this phrase is "generating."  "Generate" means "to cause to be: bring into existence."  Webster's Third New International Dictionary (Unabridged) 945 (1976).  Therefore, the Court construes this phrase as "bringing into existence through use of a PCD."

## IV.  CONCLUSION

For the reasons set forth above, the Claims Construction is resolved as follows: (1) "personal communication device (PCD)" means "a portable hand-held device capable of receiving and transmitting information – that includes a CPU or microprocessor, a data storage device, a display screen, input device, output device, and wireless communication hardware and software"; (2) "associated with at least one patron" means "in an identifiable relationship with at least one patron"; (3) "reservation" means "a position or positions in the virtual queue for an attraction"; (4) "reservation request" means "a data message that initiates the processing of a reservation that includes at least a patron or PCD identification"; (5) "generating at least one reservation request" means "bringing into existence at least one reservation request"; (6) "specifying a selected one of the attractions" means "identifying one of a plurality of attractions chosen by the patron through a corresponding Attraction ID";

(7) "proposed reservation time" means "a time reflective of a position in the virtual queue that can be accepted or rejected by the patron"; (8) "computer" and "attraction computer" mean "a computer system including a processing unit, random-access memory, disk storage, input and output devices, applicable wireless communication hardware and software, which may be implemented as: (1) a distinct processor or processing node within a computer system or group of computers; or (2) a separate computer physically disposed at or near its associated attraction"; (9) "associated with at least one of the attractions" means "in identifiable relationship with one or more of the attractions"; (10) "attraction computer associated with one of the attractions" means "attraction computer in identifiable relationship with one of the attractions"; (11) "computer associated with the selected attraction" means "computer in identifiable relationship with the specific attraction chosen by the patron"; (12) "attraction associated with the computer" and "associated attraction" mean "an attraction with which the computer is in identifiable relationship"; (13) "specifying the attraction associated with the computer" means "identifying the attraction, through an Attraction ID, with which the computer is in an identifiable relationship"; (14) "transmitting the proposed reservation time to the PCD" means "sending the proposed reservation time to the PCD"; (15) "communications module" means "transmitter/receiver designed for data transmission"; (16) "virtual queue" means "an

electronically-stored representation of a physical queue including reservation information for an attraction retained in solid-state memory such as RAM, magnetic storage such as a disk drive, or other electronic storage facility"; (17) "storing" means "recording data in an electronic device from which the data can be obtained as needed"; (18) "information describing the associated/selected attraction" means "preset static information, such as cycle capacity, estimated throughput, and operating hours, and dynamic information, such as current status and current staff, for a particular attraction"; (19) "request processor" means "hardware and associated software application of computer system that receives requests and determines a proposed reservation position in the virtual queue"; (20) "responsive to" means "based on"; (21) "previously-made reservations" means "all previously-made reservations in the virtual queue made by all patrons"; (22) "information describing previously-made reservations" means "data descriptive of previously-confirmed reservations made by all patrons"; (23) "reservation information" means "data reflecting the number and identifying information of patron(s) and their respective positions in the virtual queue"; and (24) "generating on a PCD" means "bringing into existence through use of a PCD."   No further construction of the following phrases is necessary: (1) "transmitting the reservation request"; (2) "receiving a proposed reservation time"; (3) "receiving a transmitted reservation request"; (4) "determining a proposed reservation

time"; (5) "determines the proposed reservation time"; and (6) "received reservation request."

SO ORDERED, this 28 day of August, 2006.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge